UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD DIAZ,<br><br>        Plaintiff,<br><br>    v.<br><br>CLAIRE WILLIAMS, et al.,<br><br>        Defendants. | Case No. 12-cv-05895-WHO (PR)<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

Plaintiff Ronald Diaz claims that medical staff at Pelican Bay State Prison provided constitutionally inadequate medical care for his Hepatitis-C-infected liver in violation of 42 U.S.C. § 1983. Having provided Diaz with the required warnings under *Rand v. Rowland*, 154 F.3d 952, 962–63 (9th Cir. 1998) (en banc), defendants move for summary judgment. (Docket No. 70.) The evidence necessary to establish deliberate indifference to serious medical needs is quite substantial. Diaz has not offered any evidence that would constitute a material disputed fact to show deliberate indifference. Accordingly, defendants' motion for summary judgment is GRANTED.

**STANDARD OF REVIEW**

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue for which the opposing party by contrast will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c). The Court is concerned only with disputes over material facts and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 323 (internal quotations omitted).

**FACTUAL BACKGROUND**

In his amended complaint (Docket No. 8), Diaz alleges that defendants L. Thomas, M. Sayre, S. Risenhoover, C. Williams, M. Cook, G. Lewis, C. Tileston, and D. Foston violated his Eighth Amendment rights by failing to treat his Hepatitis-C-infected liver properly. He asserts that Sayre, the Chief Medical Officer at Pelican Bay, Risenhoover, a Pelican Bay physician, Williams, another physician, and Thomas, a third physician, were deliberately indifferent to his serious medical needs when they denied him (A) a liver biopsy, (B) combination therapy, (C) a hepatic diet, and (D) liver transplant consideration. He also contends that Cook, an associate warden, Lewis, the warden, Tileston, an administrative appeals examiner, and Foston, Chief Examiner of Pelican Bay's Office of Appeals, were deliberately indifferent when they denied his requests to (A) receive the treatment the above defendants denied to him and (B) be transferred to a prison where he could receive better treatment.

The following factual allegations are undisputed unless specifically noted otherwise. In January 1998, Diaz was tested for HIV and Hepatitis A, B, and C at Solano State Prison, but he was never informed of the results of the tests. (Compl. at 3; Opp. to Mot. for Summ J. ("Opp.") at 9.) He arrived at Pelican Bay in February 2005. (Compl. at 3.) In April 2006, he asked to see a doctor because he was losing weight and feeling ill. (*Id.*) That same month, he tested positive for the Hepatitis-C virus ("HCV") antibody. (*Id.*)

HCV is an infectious disease that can lead to cirrhosis of the liver. (Mot. for Summ. J. ("MSJ"), Sayre Decl. ¶ 11.) Standards for treating HCV ("Guidelines") were approved in June 2004 by the *Madrid* court[1], which held that the Guidelines were "an adequate HCV treatment program to address the problems with treatment of chronic disease." (MSJ, Req. for Judicial Notice ("RJN"), Ex. B at 4.) The Guidelines allow for a liver biopsy and combination therapy (which is also called antiviral treatment, "AVT") for certain patients.

---

[1] *Madrid v. Woodford*, No. 3:90cv3084-THE (N.D. Cal., filed Oct. 26, 1990).

3

(*Id.*, Sayre Decl., Ex. C.)  A biopsy is not a treatment, but rather a test to determine the amount of liver damage.  (*Id.* ¶¶ 19, 21, 23.)  It requires inserting a needle into the liver and removing a piece of it, can cause internal bleeding and death in patients prone to bleeding.  (*Id.* ¶ 19.)  Biopsies are not indicated for all patients with HCV--many HCV patients are prone to internal bleeding owing to varices, or bulging veins, and low platelets.  (*Id.* ¶¶ 14, 18, 22.)

Diaz's doctors requested that Diaz be considered for a liver biopsy in May, 2006.  (MSJ, Ex. A (PBSP-00957-PBSP-01125; PBSP-01118-PBSP-01120).)[2]  To see whether he could tolerate a biopsy, his platelet level was tested.  (*Id.*)  His July 2006 lab results showed that he had a condition diagnosed as thrombocytopenia, meaning that his platelet count was persistently below the range advised for a biopsy.  (*Id.* ¶ 15, Ex. A (PBSP-01063-PBSP-01066).)  Owing to this condition and other safety concerns (occasional nose and gum bleeding), his biopsy was cancelled.  (*Id.* (PBSP-01111-PBSP-01114).)

Diaz contends that two of his blood tests showed a platelet count above 75,000 per milliliter, a level high enough that a biopsy could be performed safely.  (Opp. at 9, ¶ 40.)  At least seventeen other blood tests, however, resulted in an unacceptable platelet count.  The platelet counts in the two tests Diaz identifies were not sustained over time.  (MSJ, Sayre Decl. at p. 6, ¶ 29; Ex. C (HCV-000023).)

In July 2007, Diaz was diagnosed with a large column of esophageal varices, which were treated with medications.  (*Id.* (PBSP-01045).)  Further testing in 2010 and in March, 2011 also revealed possible esophageal varices.  (*Id.* (PBSP-00792-PBSP-00793; PBSP-00990-PBSP-00991, PSBP-00964).)

After the testing in 2010 that showed the possible varices, Dr. N. Adam requested AVT, or combination treatment, for Diaz.  Combination treatment is a course of antiviral drugs recommended under the Guidelines to treat HCV.  (MSJ, Sayre Decl., Ex. C (HCV-

---

[2] He was also enrolled in the prison's chronic care program and signed a contract acknowledging that he was not guaranteed to be endorsed for HCV treatment.  (*Id.* (PBSP-1075-PBSP-1079; PSBP-01115-PBSP-01117).)

000009-HCV-000015); RJN Ex. B.)  The *Madrid* court found that this therapy "can result in a sustained virologic response in approximately one-half of the patients who undergo it." (*Id.*, RJN, Ex. B at 5.)  The treatment is painful, time-consuming, and has many adverse effects, including anemia and a reduction in both white blood cell and platelet counts.  (*Id.*; Sayre Decl. ¶ 26.)  Because of its length and deleterious effects, combination therapy is given only to those patients who are likely to withstand it.  (*Id.*, RJN, Ex. B at 5; Sayre Decl. ¶¶ 26-29.)  Dr. Adam's request for combination therapy for Diaz was denied because Diaz did not meet the criteria for such treatment.  (*Id.* (PBSP-00591-PBSP-00593).)

Liver transplant procedures were incorporated into the Guidelines in April 2008.  (MSJ, Sayre Decl., Ex. F (HCV-000155).)   The California Department of Corrections and Rehabilitation's (CDCR's) statewide Utilization Management/Medical Authorization Review ("UM/MAR") committee identifies potential recipients of liver transplants, with ultimate approval coming from the outside transplant center being used.  (*Id.* ¶ 37.)  To be considered for a transplant, patients must have a certain MELD (Model for End-Stage Liver Disease) score, which is based on a calculation of various factors taken from blood analysis.  (*Id.* ¶ 34.)  In April 2008, the Guidelines required a score of 30 or more.  (*Id.*, Ex. F.)  In September 2008, the MELD minimum was lowered to a score of 15 or more.  (*Id.*, Ex. G.)  Diaz's MELD scores were 8 (as of March 3, 2008), 11 (as of August 12, 2008), and 12 (as of June 20, 2011).  (*Id.* at ¶ 35, Ex. A (PBSP-00560-PBSP-00561, PBSP-00773-PBSP-00774, PBSP-00779-PBSP-00781).)

Diaz met with medical staff over thirty times in relation to his HCV infection between his transfer to Pelican Bay in February 2005 and November 2012, when he initiated the current proceedings.  His treatment over this period included at least nineteen blood tests, appointments with a specialist, ultrasound scans, diet evaluation and modification, medication, and evaluations for a biopsy, liver transplant, and prison transfer.

**DISCUSSION**

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (equating standard with that of criminal recklessness). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but "must also draw the inference." *Id.* Consequently, in order for deliberate indifference to be established, there must exist both a purposeful act or failure to act on the part of the defendant and harm resulting therefrom. *See McGuckin*, 974 F.2d at 1060.

In order to prevail on a claim of deliberate indifference to medical needs, a plaintiff must establish that the course of treatment the doctors chose was "medically unacceptable under the circumstances" and that they embarked on this course in "conscious disregard of an excessive risk to [plaintiff's] health." *Toguchi v. Chung*, 391 F.3d 1051, 1058-60 (9th Cir. 2004). A claim of mere negligence related to medical problems, or "the inadvertent failure to provide medical care, or a difference of opinion between a prisoner patient and a medical doctor, is not enough to make out a violation of the Eighth Amendment. *Id.*; *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). The mere fact that a prisoner does not receive adequate medical care does not necessarily create a claim for "deliberate indifference" to serious medical needs for purposes of imposing liability under 42 U.S.C. Section 1983. *Id.* at 105-06. Mere negligence or "the inadvertent failure to provide medical care" will not sustain a Section 1983 claim. *Id.* at 105.

**I.      Claims Against Sayre, Risenhoover, Williams, and Thomas**

Diaz claims that Sayre, Risenhoover, Williams, and Thomas were deliberately indifferent to his serious medical needs when they denied him (A) a liver biopsy, (B) combination therapy, (C) a hepatic diet, and (D) liver transplant consideration. He has not shown a genuine dispute on any issue that the defendants' conduct was "medically unacceptable under the circumstances" and that they embarked on it in "conscious disregard of an excessive risk" to his health. *Toguchi*, 391 F.3d at 1058-60. His

disagreement with the course of treatment is not sufficient to show genuine dispute. *Id.* Defendants' motion for summary judgment on these claims is GRANTED for the reasons explained in more detail below.

### A. Denial of Liver Biopsy

Defendants declined to biopsy Diaz's liver because of their serious medical concerns for his safety. Diaz's platelet count was below normal levels and he had esophageal varices, making a biopsy dangerous. With such low platelets, a biopsy would likely cause internal bleeding that would not clot. This in turn could cause a rupture of esophageal varices, which is the most common cause of death in patients with cirrhosis or end-stage liver disease ("ESLD").

Diaz contends that medical staff were deliberately indifferent in delaying their diagnosis of HCV and that if he had been tested sooner, his platelet count would have been high enough to qualify for a biopsy. (Opp. at 22.) To support his claim that undue delay caused his platelet count to fall below the threshold for a biopsy, Diaz mistakenly points to a record that shows his platelet count at 210. While Diaz asserts that this was his platelet count when he arrived at PBSP in 2005, in fact the document on which he relies is a medical record from January 1998, some seven years before his transfer to Pelican Bay. (*Id.*, Ex. A at 2.) There is no evidence of his platelet count when he was transferred to Pelican Bay in 2005 or of how much it may have dropped between the date he arrived at Pelican Bay and his diagnosis in 2006.

Diaz made the request for HCV testing in March 2006. There is nothing in the record to indicate Diaz could not have requested testing sooner if he was concerned about potential risk of infection.[3] Even if the medical staff's failure to test Diaz for HCV sooner

---

[3] Diaz also alleges that defendants engaged in acts of fraudulent concealment of his medical records. (Opp. at 22.) In support of this claim, Diaz refers to PBSP-01091 in Exhibit A of Sayre's Declaration. However, this page does not exist within the record so the Court is unable to evaluate this claim, and it would be unlikely to create a disputed material fact in any event.

could be found to constitute negligence or gross negligence (and on this record there is no evidence of fault at all), neither negligence nor gross negligence is actionable under section 1983. *Farmer*, 511 U.S. 825, 835–36 & n.4 (1994).

Diaz also claims that defendants ignored the recommendations of hematological specialist Dr. Bonis in favor of a biopsy. Contrary to Diaz's assertions, Bonis did not recommend a biopsy. While Bonis wrote that there was "no absolute contraindication to having a biopsy of [Diaz's] liver," he concluded that, "Unfortunately [Diaz's] platelet counts will remain a lifelong issue and one would need to weigh the risk/benefit ratio as to if a biopsy of the liver was obtained what would be done with that result more long term." (MSJ, Sayre Decl., Ex. A (PBSP-00946).) Defendants did not allow a biopsy in an exercise of caution as a result of Diaz's low platelet count and varices. That Diaz disagrees with their conclusion does not establish a genuine dispute of material fact that could show deliberate indifference.

### B. Denial of Combination Treatment

Defendants denied the use of combination therapy for essentially the same serious medical reasons they denied the administration of a biopsy, that is, his low platelet count and his esophageal varices. The Guidelines for treatment of HCV state that if a patient has "decompensated cirrhosis," which is marked by varices, acites, jaundice, or low platelets, he cannot safely receive combination therapy. As discussed above, a platelet count below 75,000 per milliliter is also an absolute contraindication for combination therapy. Because administration of combination treatment was likely to cause harm to Diaz, defendants refrained from using it. Instead, they provided medication, reviewed his diet, made ultrasound observations, and continued to monitor his platelet count for improvement. (MSJ, Sayre Decl. Ex. A (PBSP-01291-PBSP-01292).)

Diaz's contention that two tests showed an acceptable platelet level is outweighed by the fact that those levels were not sustained. Seventeen other tests were below the minimum level required. Even if Diaz's low platelet count was not an absolute contraindication for combination therapy, it would still have been reasonable for doctors to

1   deny combination therapy on the grounds that (i) Diaz had esophageal varices, (ii) he
2   showed symptoms of decompensated cirrhosis, and (iii) combination therapy has serious
3   adverse side effects, including a reduction in platelets.  (MSJ, Sayre Decl. p. 6, ¶ 29; Ex. C
4   (HCV-000023).)  There is no genuine dispute that defendants' decision to refuse
5   combination therapy was "medically unacceptable under the circumstances" and that they
6   embarked on this course in "conscious disregard of an excessive risk" to his health.
7   *Toguchi*, 391 F.3d at 1058-60.

### C. Denial of Hepatic Diet

Diaz was originally recommended for and placed on a hepatic diet, the guidelines for which were revised in April 2008.  (MSJ, Sayre Decl. ¶¶ 31-32.)  The original guidelines for a hepatic diet were designed to restrict protein from the diet of patients suffering from frank hepatic encephalopathy, an accumulation of toxic substances derived from protein metabolism.  (*Id.*)  The April 2008 revisions encouraged protein in the diet for decompensated cirrhosis patients who did not show signs of encephalopathy and could thus tolerate higher levels of protein.  (*Id.*)  Since Diaz showed no signs of encephalopathy, Sayre disapproved the hepatic diet, keeping in line with the guidelines.  (*Id.*)

Diaz asserts that that the hepatic diet is the same as a low salt diet and contends that a low-salt diet would have alleviated episodic abnormalities of mental problems, breakouts in rashes, and itching that he was experiencing.  (Am. Compl. at 14.)  He again misreads the record on which he relies.  The Chronic Care Program for Hepatitis C,  Exhibit F of Sayre's Declaration (HCV-000154), refers to two different diets:  the "CDCR low-salt, low fat, 'heart healthy' diet," and a "Low Protein Diet" for those who have symptoms of encephalopathy.  It is the latter diet that is the hepatic diet, not the former.  Diaz also mischaracterizes the qualification for being put on the hepatic diet as being "diagnosed with end-stage liver disease (ESLD)."  (*Id.*)  According to the revised diet guidelines implemented in April 2008, the hepatic diet was only necessary for ESLD patients suffering from hepatic encephalopathy, from which Diaz was not suffering.

Diaz also claims that "counseling on nutrition and continuance on a heart healthy

diet was inadequate to reduce the pain and suffering [he] was forced to endure." (Opp. at 15.)[4] While he describes his dissatisfaction with the efficacy of the treatment, he does not show a genuine dispute that defendants were deliberately indifferent.

### D. Denial of Liver Transplant Consideration

Defendants had no authority to place Diaz on a liver transplant list--that is done by the CDCR statewide UM/MAR committee. Diaz's MELD scores were too low to require defendants to propose him for placement. Diaz nonetheless contends that defendants omitted "certain elements relevant to liver transplant evaluations, i.e., age/mental health instability/and other life threatening condition." (Opp. at 15.)

Again, Diaz may misunderstand the record on which he relies. It lists mental health instability and other life threatening conditions as contraindications for liver transplantation, not the reverse. (MSJ, Sayre Decl., Ex. F (HCV-000155).)

Diaz's assertions that defendants continuously refused or denied requests to see specialists has little bearing on the denial of his liver transplant, which is determined primarily by MELD score. (*Id.*) The MELD system is simply a formula used to calculate a score based on a patient's date of birth, values for serum bilirubin, serum creatinine, and prothrombin time ("INR"), and whether the patient is undergoing dialysis. (MSJ, Sayre Decl., Ex. F (HCV-000155).) The September 2008 CDCR Guidelines provide transplantation evaluations for patients with a MELD score of 15 or higher. (*Id.*, Ex. G (HCV-000195).) The United Network for Organ Sharing ("UNOS"), the single national database and waitlist for organ transplantation, uses MELD scores to rank a patient's priority for liver transplantation, with a maximum score of 40 indicating the highest priority.

Diaz's claim that defendants "produce no evidence that they followed the MELD

---

[4] It is unclear from the record whether the CDCR's standard diet is the heart healthy diet or whether, if not, Diaz ever requested the heart healthy diet. That is not material here, since Diaz's claim concerned the hepatic diet and there is no evidence that the diet provided to him caused an excessive risk to his health that was medically unacceptable under the circumstances.

10

system to the letter" (Opp. at 15) is without merit. Diaz underwent repeated blood tests, which included measurements of these values that were used to calculate his MELD score. (*Id.*, Ex. A (PBSP-00779-PBSP-00781, PBSP-00773-PBSP-00774, PBSP-00560-PBSP-00561).) Diaz's highest recorded MELD score was 12. (*Id.*, Ex. A (PBSP-00779-PBSP-00781).) Diaz's MELD score precluded him from consideration for transplantation under the Guidelines. It indicated that he would be a relatively low priority even if he were referred to the UNOS waitlist. In short, it showed that his chances of receiving a transplant were slim. Diaz has not shown a genuine dispute that defendants' decision to not recommend him for a transplant was "medically unacceptable under the circumstances" and that they embarked on this course in "conscious disregard of an excessive risk" to his health. *Toguchi*, 391 F.3d at 1058-60.

## II. Administrative Denials

Defendants Cook and Tileston reviewed and rejected Diaz's inmate appeals regarding his (A) treatment and (B) request for a transfer to another prison. Lewis and Foston are named as defendants because they supervised Cook and Tileston. None of Diaz's claims against these defendants creates a disputed issue of material fact.

### A. Denial of Administrative Grievances for Treatment

As determined above, Diaz has not shown a genuine issue of material fact that defendants Sayre, Risenhoover, Williams, and Thomas were deliberately indifferent to his serious medical needs. Since no genuine dispute of material fact exists as to their actions, Diaz cannot show a genuine dispute that those who reviewed his complaints about his treatment (Cook and Tileston) were deliberately indifferent. It follows that Diaz has not shown a genuine dispute as to the actions of Cook's and Tileston's supervisors, Lewis and Foston. Accordingly, defendants' motion for summary judgment is GRANTED in favor of these defendants as to this claim.

### B. Denial of Transfer Request

In May 2011, Diaz appeared before the Institutional Classification Committee to review Diaz's gang validation and housing in the Secured Housing Unit. The committee

noted a medical classification chrono that recommended a transfer to Sacramento State Prison owing to Pelican Bay being only a "basic care institution." (MSJ, Townshend Decl., Ex. B at 2.) This transfer recommendation was denied because there was no indication that Diaz could not be cared for at Pelican Bay. Though his medical needs were deemed "High Risk," he is also "deemed low-intensity nursing." (*Id.*) The transfer was also denied because Diaz is a validated gang member who poses a security risk. (*Id.*) Diaz's appeals regarding this matter were denied. (*Id.*)

Diaz has supplied no specific medical reasons that Pelican Bay was not able to care for him such that the denial of transfer amounted to deliberate indifference. Nor has he shown that Sacramento offered a course of treatment so superior to Pelican Bay's that the transfer denial was "medically unacceptable under the circumstances" and was embarked on in "conscious disregard of an excessive risk to [plaintiff's] health." *Toguchi*, 391 F.3d at 1051. There is no genuine issue that the transfer denial constituted deliberate indifference. Accordingly, defendants' motion for summary judgment is GRANTED in favor of these defendants as to this claim.

## CONCLUSION

Defendants' motion for summary judgment (Docket No. 70) is GRANTED. The claims against M. Scott, Linda Rowe, and Dr. Wahidullah are DISMISSED because service of the complaint on them was never effected. The Clerk shall terminate Docket No. 70, enter judgment in favor of L. Thomas, M. Sayre, S. Risenhoover, C. Williams, M. Cook, G. Lewis, C. Tileston, and D. Foston as to all claims, and close the file.

**IT IS SO ORDERED.**

**Dated:** March 27, 2015

WILLIAM H. ORRICK
United States District Judge

12